UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

SARA E. LUNSFORD )
)
V. ) NO. 2:14-CV-235
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for Supplemental Security Income under the Social Security Act was administratively denied following a hearing before an Administrative Law Judge. This is an action for judicial review of that decision. The Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 13], while the Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 15].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The Plaintiff was a younger individual under the Social Security regulations at the date of the alleged onset of her disability on March 2, 2009, and remains so today. She has an 8th grade or "limited" education. There is no dispute that she cannot return to her past relevant work as a short-order cook or convenience store attendant.

The Plaintiff's medical history is set forth in the Defendant's brief as follows:

> In early September 2010, Plaintiff went to the emergency room following a fall and complained of back and hip pain that she rated as a 9 on a 10-point pain scale (Tr. 403-04). Her low back was tender, but her physical examination was otherwise normal (Tr. 404). Straight leg raising was negative (Tr. 404). X-rays of her sacrum and coccyx were normal (Tr. 427). Two weeks later, Plaintiff returned to the emergency room complaining of hip and back pain that had begun two days earlier (Tr. 399-402). Upon physical examination, her low back was tender but her examination was otherwise normal (Tr. 402). X-rays of her left hip were normal (Tr. 428).
> A few days later, Plaintiff was admitted to hospital, and then transferred to Lake Shore Mental Health Institute, after overdosing on Klonopin tablets (Tr. 307-09, 316-20). She had taken the overdose in an attempt to commit suicide, but had immediately called 911, stating it was an act of desperation (Tr. 314). Plaintiff reported previous mental health admissions in 2005 after she discovered her husband was cheating on her, and again in June 2010 (Tr. 316). She denied previous suicide attempts (Tr. 317). She had a doctor and therapist that she liked and was taking Paxil for her psychological symptoms, which she liked fairly well (Tr. 316-17). Upon mental status examination, Plaintiff was tearful when talking

about her husband and her "mistakes in life," but was hopeful for the future and motivated (Tr. 318). She was able to collect her thoughts appropriately and interacted well (Tr. 318). Her long and short-term memories were intact (Tr. 318). Attention and concentration were appropriate (Tr. 318). Intelligence was average (Tr. 318). She could interpret simple proverbs, could name the last three presidents, recall three words after five minutes, and could do some basic math calculations (Tr. 318). Her insight and judgment were fair (Tr. 318). At discharge, she was calm, relaxed, and cooperative, and not depressed, suicidal, confused, agitated, or psychotic (Tr. 317). She had no limitations on her activities (Tr. 318). A chest x-ray was normal (Tr. 314).

Plaintiff saw her doctor for medication management for depression and anxiety in November 2010 (Tr. 321). Her mental status examination was normal (Tr. 321). The doctor prescribed Paxil, but discontinued Klonopin and any other controlled substances (Tr. 321).

In December 2010, George Davis, Ph.D., a State agency psychological consultant, opined that Plaintiff had borderline intellectual functioning, depressive disorder, anxiety disorder, and personality disorder (Tr. 334-46). He opined that her impairments resulted in moderate restrictions in activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, and pace; and one or two episodes of decompensation, each of extended duration (Tr. 344). In formulating the RFC, Dr. Davis opined that Plaintiff could only perform one-, two-, or three-step tasks (Tr. 350). She had the ability to maintain attention and concentration for periods of at least two hours (Tr. 350). She would have occasional interruptions from psychologically based symptoms, but overall could sustain work (Tr. 350). She had the ability to interact appropriately with co-workers, supervisors, and the general public (Tr. 350). She could have occasional contact with the general public (Tr. 350). She could adapt to infrequent changes (Tr. 350).

In early August 2011, Plaintiff went to the emergency room with back, leg, and hip pain (Tr. 359). She was treated for her pain, and at discharge, complained of a sudden onset of chest pain (Tr. 359). She was admitted for a three-day stay in the hospital due to acute pancreatitis, but diagnostic testing was not indicative of pancreatitis (Tr. 358). Lyrica helped her back and leg pain (Tr. 358). A chest x-ray showed bilateral linear atelectasis, but otherwise no acute abnormalities (Tr. 385). At discharge, she could return to her normal activities as tolerated (Tr. 373).

In August 2011, Kristine Freeman, M.D., Plaintiff's primary care physician, completed an RFC questionnaire (Tr. 397-98). She stated that she had treated Plaintiff every 3 months for the past 11 years (Tr. 397). Diagnoses included hip pain, back pain, neuropathy, neuralgia, anxiety, bipolar, and COPD (Tr. 397). Associated symptoms included fatigue, insomnia, and restless leg syndrome (Tr. 397). She opined that Plaintiff's symptoms frequently interfered with the attention and concentration necessary to perform simple work-related tasks, and that Plaintiff's medications could cause sedation (Tr. 397). She opined

3

that Plaintiff could walk for less than one city block without rest or significant pain (Tr. 397). She stated Plaintiff could sit for five minutes at a time and three hours total and could stand and walk for three hours total during an eight-hour workday (Tr. 397). She opined that Plaintiff would need to be able to shift positions at will and would need up to 5 unscheduled breaks during the day, each break lasting 15 to 30 minutes (Tr. 397). She stated Plaintiff could lift 20 pounds occasionally (Tr. 398). She could only use her hands and fingers 30 percent of the day and could use her arms 10 percent of the day (Tr. 398). She thought that Plaintiff was likely to miss work more than four times each month due to her impairments and treatments (Tr. 398).

In October 2011, Plaintiff went to the emergency room with complaints that she had been coughing up bloody mucus (Tr. 430). She also reported a medical history of fibromyalgia (Tr. 430). The doctor observed that Plaintiff fell asleep and had to be woken up five times for her examination that took place around 2:00 pm in the afternoon (Tr. 431). She had decreased air movement, but her physical examination was otherwise normal (Tr. 431). The nurse observed that Plaintiff appeared well and was independent in her activities of daily living (Tr. 432). A chest x-ray showed shallow inspiration but no acute cardiopulmonary disease (Tr. 437).

In November 2011, Plaintiff saw Dr. Freeman for a follow-up visit and reported that functioning was very difficult due to increased anxiety (Tr. 562). Her brother had died that morning (Tr. 562). Plaintiff reported that her low back, leg, and hip pain was severe and aggravated by stairs, changing positions, daily activities, extension, flexion, lifting, pushing, rolling over in bed, standing, twisting, and walking (Tr. 562). Her pain symptoms were relieved with medication (Tr. 562). Upon physical examination, her lumbar spine was tender (Tr. 565). Both hips were tender and had moderate pain with motion (Tr. 565). Mental status examination revealed a severely depressed mood and affect (Tr. 565).

In January 2012, Plaintiff was hospitalized for suicidal ideation (Tr. 582). She reported that she had been doing well until the week earlier, when she started feeling very depressed (Tr. 584). She stated she was under a significant amount of stress due to taking care of her grandmother and a three-month old child, and an increase in family and financial problems (Tr. 584). She also stated that she had been doing well on Paxil, but experienced difficulties when she switched medications to Celexa (Tr. 584). Upon mental status examination, her mood and affect were depressed and anxious (Tr. 585). She was fully oriented, cooperative, verbal, and made good eye contact (Tr. 585). Her speech was normal (Tr. 585). Her thought content was without delusions or hallucinations (Tr. 585). Her thought processes were intact and her train of thought was goal-directed (Tr. 585). Her immediate memory was intact though her short-term memory was impaired (Tr. 585). She was unable to spell "world" backwards (Tr. 585). Her judgment was intact and her insight was good (Tr. 585). The doctor discontinued Celexa and continued Plaintiff's Lyrica and Klonopin (Tr. 585). Her physical examination

4

was unremarkable (Tr. 582-83).

In March 2012, Kirsh Purswani performed a physical consultative examination of Plaintiff (Tr. 625-28). Dr. Purswani stated that Plaintiff's medical history did not seem credible because she related numerous serious diagnosis without supporting facts (Tr. 625). She did not appear in apparent distress; her gait and station were normal and she did not use an assistive device (Tr. 626). She could get on and off the examination table without help and was able to follow instructions (Tr. 626). Her lungs were clear to auscultation and examination of her heart was normal (Tr. 627). Range of motion was normal in her shoulders, elbows, wrists, hands, knees, and ankles (Tr. 627). Range of motion in her hips was normal except for flexion bilaterally (Tr. 627). She had no tenderness of the lower legs (Tr. 627). She had mild levoscoliosis at the thoracic spine and her back was tender (Tr. 628). Straight leg raise was positive bilaterally (Tr. 628). Range of motion of her back was normal (Tr. 628). She had good strength in her upper and lower extremities (Tr. 628). Her toe and heel strengths were normal; she could stand on each foot; tandem gait and deep tendon reflexes were normal (Tr. 628). Dr. Purswani opined that Plaintiff could frequently lift 30 pounds, could stand and walk for 5 hours, and could sit for 8 hours during an 8-hour workday (Tr. 628).

Also in March 2012, Anna Palmer, M.S., SPE, performed a psychological consultative examination of Plaintiff (Tr. 629-32). Ms. Palmer observed that Plaintiff made appropriate eye contact and her hygiene and grooming were within normal limits (Tr. 630). No psychomotor abnormalities were noted (Tr. 630). Plaintiff's affect was sad, nervous, and slightly tearful (Tr. 630). She was alert and oriented (Tr. 630). Her attention was intact and her concentration was limited (Tr. 631). Plaintiff's memory was intact (Tr. 631). Numerical reasoning and visuospatial ability were within normal limits (Tr. 631). Ms. Palmer estimated that Plaintiff functioned in the low average range of intelligence (Tr. 631). She related well and her fine motor skills appeared normal (Tr. 632). Ms. Palmer assessed Plaintiff as capable of comprehending and following simple and detailed job instructions but limited to making simple work-related decisions due to moderate difficulties in concentration and persistence (Tr. 632). She assessed that Plaintiff had a satisfactory ability to interact with others appropriately and manage her own hygiene (Tr. 632). She opined that Plaintiff did not appear limited in her ability to adapt to changes in the workplace, be aware of normal hazards, or take appropriate precaution (Tr. 632).

In March 2013, Plaintiff reported significant back pain and right leg pain since November 2012 (Tr. 778). An MRI revealed a right sided L5-S1 herniated nucleus pulposus with a fragment that had migrated inferiorly and had impinged on the descending S1 nerve root on that side (Tr. 780). She underwent right L5 laminotomy with microdiskectomy and reported improvement in her pain (Tr. 778).

[Doc. 16 pgs. 3-9].

Following the Plaintiff's testimony at her administrative hearing on May 1, 2013, the ALJ called Ms. Cathy Sanders, a vocational expert ["VE"] to testify. After Ms. Sanders identified the classifications of Plaintiff's past relevant work, she was asked the following hypothetical: "[i]f I find…that she is restricted to sedentary work with no climbing of ladders, ropes or scaffolds, no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching or crawling and no concentrated exposure to hazards or pulmonary irritants; mentally, if I find that she is able to perform and maintain concentration and persistence for simple, routine, repetitive tasks; if I find that she's able to adapt to gradual and routine changes in the work setting; and, finally, if I find that she's limited to work that requires no more than occasional interaction with the public, coworkers and supervisors, all those limits would preclude her past work, correct?" Ms. Sanders answered that it would. He then asked if, with those limitations, there would be work a person with Plaintiff's age, education and vocational experience could perform. Ms. Sanders identified 112,000 jobs in the nation and 2,300 jobs in the region that the Plaintiff could perform with those limitations. If Plaintiff could only sit for four hours in an eight hour workday, there would be no jobs. Upon examination by the Plaintiff's lawyer, Ms. Sanders said there would also be no jobs if the person required a sit/stand option. (Tr. 998-999).

On May 17, 2013, the ALJ rendered his hearing decision. After finding that the Plaintiff had not engaged in substantial gainful activity since the date of her application on September 2, 2010, he found that she "has the following severe impairments: right L5-

6

S1 herniated nucleus pulposus; status-port L5 laminotomy with microdiskectomy; obesity; COPD; Borderline intelligence; Major Depressive Disorder, Recurrent, Moderate; Anxiety Disorder NOS; Bipolar Disorder; and Personality Disorder." (Tr. 24).

As part of finding whether the Plaintiff met or equaled one of the Listing of Impairments in the regulations, he found that she had a moderate restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence or pace. He also found she "has experienced one or two episodes of decompensation, each of extended duration." (Tr. 25). He noted one of these episodes "was directly related to an overdose of Klonopin." (Tr. 25).

The ALJ then stated his finding of the Plaintiff's residual functional capacity ["RFC"]. He found she had the capacity "to perform sedentary work as defined in 20 CFR 416.967(a) except that she is limited to occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling and should never climb ladders, ropes, or scaffolds or perform work requiring concentrated exposure to pulmonary irritants or hazards. The claimant is able to perform simple, routine, repetitive tasks and maintain concentration and persistence for simple instructions. She is able to adapt to gradual and routine changes in a work setting and perform work requiring no more than occasional interaction with the public, co-workers, and supervisors."

He then stated that he was required to determine if the Plaintiff had conditions which could cause her symptoms, and if they could, to what extent the symptoms limited her ability to function. To do this, he must address Plaintiff's credibility if the medical

evidence alone did not account for the severity alleged. (Tr. 26). He described her testimony at the hearing. He found Plaintiff not entirely credible after considering the evidence and her statements about "the intensity, persistence and limiting effects of these symptoms…" (Tr. 27).

He then recounted the medical evidence, pointing out first that "the majority of the medical evidence consists of numerous emergency room visits…" He described the various diagnoses from those visits, the x-rays and CT scans taken, and the various physical examinations done as a result of those visits. (27-28).

He discussed her treatment at Rural Health Services Consortium beginning June 5, 2008. After describing their various diagnoses, describing her weight and continued tobacco use, and various mental findings, he noted that "she violated her pain management agreement and would no longer be prescribed narcotic or anxiolytic medications." (Tr. 28).

After discussing an August 1, 2011 hospital admission, and the results of tests there, he began to discuss her back pain. He noted that an MRI showed the herniated nucleus pulposus with a fragment impinging on the S1 nerve root at L5-S1. He then stated that she had a "right L5 laminotomy with microdiscectomy" on March 1, 2013. He noted merely that she "tolerated the procedure well." He discussed Dr. Purswani's consultative physical exam on March 28, 2012, noting the various unremarkable findings. (Tr. 23).

The ALJ then explained why he felt the "objective evidence fails to document an

8

impairment or combination of impairments which would preclude work" at the RFC level the ALJ had found. He noted her "longstanding history of COPD" while she continues to smoke cigarettes. He stated that there were gaps in her treatment. He spoke again of the back surgery and noted that the Plaintiff stated "she is feeling somewhat better but continues to have back pain radiating to her lower extremity." The ALJ observed that having the back surgery "certainly suggests that her symptoms were genuine." He said that the fact she had the surgery "would normally weigh in the claimant's favor," but that "it is offset by the fact that the record reflects that the surgery was generally successful in relieving her symptoms."

He then stated that because of her back problems, he was limiting her to the reduced range of sedentary work described in his RFC finding and the hypothetical to the VE. He then discussed her "good use of her arms and legs" and that she "moves about in a satisfactory manner." He noted that while Plaintiff alleges she has fibromyalgia, the record doesn't document this condition. He then said "the objective evidence fails to document an impairment…which would be expected to result in severe disabling pain." He further found the Plaintiff's credibility was diminished by her non-compliance with the pain management agreement she entered with Rural Health Services Consortium. This non-compliance resulted in their refusing to further prescribe narcotic pain medication to her. (Tr. 29-30).

He then discussed the weight given to the various medical opinions. He gave partial weight to Dr. Purswani's report because he felt that the back surgery after the

9

consultative exam "supports a conclusion that the claimant is more limited in her ability to stand and walk than determined by Dr. Purswani." (Tr. 30).

He then discussed the opinions of Dr. Freeman, the treating physician. Dr. Freeman had opined that Plaintiff had neuropathy and neuralgia in addition to her other physical and mental impairments. She opined that Plaintiff's symptoms would frequently interfere with Plaintiff's ability to perform simple work related tasks, and that Plaintiff would need to recline or lie down during an eight-hour workday in excess of normal breaks. To all of this, the ALJ responded by finding that neuropathy and neuralgia were not indicated or supported in the treatment record. Also he found her opinion "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion." He said that the treatment records of Dr. Freeman failed "to reveal the type of significant clinical abnormalities one would expect if the claimant were in fact disabled." He concluded she was entitled to little weight. (Tr. 30).

He gave little weight to the State Agency doctors because, once again, evidence not reviewed by them such as the record of her surgery "reveals that the claimant is more limited than previously determined." (Tr. 30).

He then discussed the claimant's September 25, 2010 admission to Indian Path Medical Center following an overdose of Klonopin. He noted that when she was discharged, she was tolerating her medications well and interacting well with the hospital staff and peers. (Tr. 31).

He discussed her medical records relating to her ongoing marijuana use, including

10

a January, 2006 hospitalization. He spoke of another hospitalization in January, 2012 for suicidal ideation brought about by "family conflicts and conflict with her boyfriend." He then discussed the March, 2012 consultative exam by Anna Palmer, once again noting ongoing use of cannabis. Ms. Palmer's report indicated no more than moderate mental limitations. He gave Ms. Palmer's report great weight, along with the State Agency psychologist. (Tr. 32).

Even though the Plaintiff could not return to her past relevant work, primarily due to both jobs requiring light exertion, he found that significant numbers of jobs existed, according to the VE, for a person with Plaintiff's RFC given her age and educational background. Accordingly, he found that she was not disabled. (Tr. 33-34).

Plaintiff asserts that the ALJ erred in several respects. First, she claims that the ALJ erred by giving little weight to the opinion of Dr. Kristin Freeman. Plaintiff asserts that Dr. Freeman, as her treating doctor, should have been given controlling weight. At the very least, if not entitled to controlling weight, Dr. Freeman should have been given "great deference." She also states that since the Plaintiff was found by the ALJ to be so severely hindered in her RFC, the ALJ should have "fully credited" Dr. Freeman's opinion, particularly since she asserts that the ALJ "pointed to no evidence which supported his residual functional capacity as opposed to Dr. Freeman's." Finally with respect to Dr. Freeman, Plaintiff asserts that the ALJ failed to give any good reason for the low weight he gave her opinion.

Second, the Plaintiff maintains that the ALJ erred by failing to adequately include

11

all of the Plaintiff's physical and mental impairments. In this regard, she states that he did not include the limitations opined by Dr. Freeman with regard to the Plaintiff's use of her hands, or that she would miss more than four days of work a month. From a mental standpoint, she argues that the ALJ limiting her to simple, routine, repetitive tasks with gradual changes in the work setting and little contact with the public, supervisors or coworkers does not adequately cover the moderate limitations found by the ALJ, citing *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010). Also, she asserts that the ALJ failed to analyze her claim under Social Security Ruling 96-9p, which applies to cases in which a claimant is limited to less than a full range of sedentary work.

Third, the Plaintiff asserts that the ALJ did not give proper weight to her subjective allegations. In other words, she states that he erred in not finding her completely credible.

The ALJ is tasked with assessing the credibility of a Social Security claimant at step four of the sequential evaluation process. The ALJ, if he or she finds the claimant to be not entirely credible in his or her subjective complaints, has to explain the basis for the adverse findings. The hearing decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." SSR 96-7p. At the same time the ALJ, as the trier of fact, has great latitude in assessing credibility of any witness, including the claimant, and the Court must respect that latitude

in determining whether the reasons given by the ALJ are adequate.

Here, the ALJ did, in fact, find the Plaintiff partially credible to the extent that he limited her to a much reduced range of sedentary work. To the extent he found her less than fully credible, he pointed first to Plaintiff's daily activities, which included doing some household chores, watching television and listening to music, walking around the yard, talking to friends, calling her mother, shopping, cooking and attending church (Tr. 25). She also told Dr. Thimmappayya Hasanadka with the Tennessee Department of Mental Health and Developmental Disabilities in September of 2010 that she quit her last job in 2008 to take care of her grandfather. (Tr. 317). Also, when she was admitted to Wellmont in January of 2012, she told the doctor she was "taking care of her granny [and a] 3-month-old baby who is a niece's daughter." (Tr. 584).

No doctor ever put restrictions on her in any treatment note. Many encouraged her to pursue activities as tolerated (Tr. 318, 373, 432). When she was discharged following the back surgery, she was told "to increase the frequency and duration of ambulation daily…," with the only restrictions to avoid lifting heavier than 10 pounds, repetitive bending and twisting, and from driving for 10 to 14 days. (Tr. 778). The ALJ also noted that the Plaintiff's violation of her narcotic pain medication agreement (Tr. 30, 726) and her continuing illegal cannabis use detracted from her credibility.

It is true that the Plaintiff underwent back surgery, and the ALJ recognized that this supported parts of her allegations. However, he also noted that her post-operative records indicated improvement in her radiating pain. The ALJ sufficiently explained his

13

finding that the Plaintiff was only partially credible in her description of her symptoms.

As stated, Plaintiff also alleges the ALJ erred in not including all of her physical and mental limitations in his RFC finding and question to the VE. Regarding the physical limitations, Plaintiff argues that the ALJ did not include the various limitations opined by Dr. Freeman. As for her mental impairments, Plaintiff next suggests that as a result of *Ealy v. Commissioner of Soc. Sec.*, 594 F.3rd 504 (6th Cir. 2010), and other cases, merely limiting a Plaintiff to jobs which are "simple, routine, repetitive tasks" with only "gradual and infrequent changes in the work setting" and no contact with the general public does not accurately describe the Plaintiff's moderate functional restrictions in concentration, persistence or pace. Thus, states Plaintiff, the ALJ cannot rely upon the hypothetical in his finding that jobs existed and that the Plaintiff was not disabled.

In *Ealy*, the hypothetical asked by the ALJ to the VE was very similar to that used by the ALJ in the present case. He asked the VE to "assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings." *Id.* at 516. In that case, the ALJ was relying upon the opinion of a state agency psychologist. The Sixth Circuit noted that the ALJ stated that his assessment was "consistent" with that of the psychologist. The problem was that it was not. One of the state agency psychologist's specific findings was that "the ability of Mr. Ealy to sustain attention to complete simple repetitive tasks was limited to [two-hour] segments over an eight hour day where speed was not critical." *Id.* The Court stated that for the ALJ's hypothetical to accurately describe Mr. Ealy's situation, it would have to state that "the speed of his performance

14

could not be critical to his job."

In the present case, there is no such special requirement, only a moderate limitation. In *Ealy,* the Sixth Circuit found that where medical source opinions specifically limited Plaintiff's ability to sustain attention and imposed restrictions in pace, speed and concentration, the ALJ's "streamlined" hypothetical omitting those restrictions was insufficient. Other post-*Ealy* decisions declined to adopt a bright line rule that a limitation to "simple repetitive tasks" in an RFC and hypothetical to the VE is not adequate to address a claimant's moderate impairment as to concentration, persistence, and pace." *Horsely v. Astrue*, No. 1:11-CV-703, 2013 WL 55637, at *8 (S.D. Ohio Jan. 3, 2013) *report and recommendation adopted sub nom. Horsley v. Comm'r of Soc. Sec.,* No. 1:11CV703, 2013 WL 980315 (S.D. Ohio Mar. 13, 2013); s*ee also, Jackson v. Commissioner of Soc. Sec.*, 2011 WL 4943966 (N.D. Ohio. 2011). The Court finds that the hypothetical question in the present case was adequate to express the limitations found by the ALJ, and that there was substantial evidence for those limitations. *Smith-Johnson v. Commissioner*, 579 Fed. Appx. 426 (6th Cir. 2014).

Plaintiff also asserts that the ALJ erred in not finding the Plaintiff disabled under Social Security Ruling 96-9P, 1996 WL 374185, which addresses adjudication of cases where the claimant can only perform a reduced range of sedentary work. Ultimately, it requires the ALJ, "in more complex cases," to utilize a vocational expert, which is exactly what was done in this case. This Ruling does not in any way mandate a finding of disability.

15

The final and most important argument is that the ALJ erred in the weight that he gave to Dr. Freeman. The Plaintiff relies upon *Gayheart v. Commissioner of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013). In that case, the Sixth Circuit remanded the matter for reconsideration, finding that the ALJ did not correctly weigh the medical opinions as required by 20 C.F.R. § 404.1527(c). Under the regulations, Social Security Rulings, and case law, the Court stated that "treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.' 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence., *id.* § 404.1527(c)(2)-(6)." *Gayheart*, *supra*, at 376.

The Court noted that the ALJ accorded little weight to the opinion of the Plaintiff's long time treating psychiatrist, but instead relied upon consultative examining psychologists and one who testified at the hearing as a medical expert. While the ALJ found that the opinion of the treating psychiatrist did not meet either prong to be accorded controlling weight, that it be well-supported by medically acceptable techniques and was not inconsistent with the other substantial evidence, the Court found that he did not give adequate reasons for so finding. Also, in *Gayheart,* after his failure to accord the

treating psychiatrist controlling weight, the ALJ failed to give adequate reasons for the lack of weight he gave her when comparing her opinions to those of the non-treating sources to which he gave great weight. The Court stated that the ALJ's "failure to provide 'good reasons' for not giving (the treating psychiatrist) controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Id.*, at 377.

Mainly, the Court found that "the ALJ does not identify the substantial evidence that is purportedly inconsistent with (the treating psychiatrist's) findings." *Id.* The Court then stated that "surely the conflicting substantial evidence must consist of more than the medical opinions of the non-treating and non-examining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources." *Id.*

Likewise, the Court found that "the ALJ's focus on isolated pieces of the record is an insufficient basis for giving...little weight" to the treating psychiatrist. *Id.* at 378. These included occasional activities of that Plaintiff and clinic note references of the psychiatrist to the Plaintiff looking forward to being outside and planning to buy a new lawnmower blade. The Court also criticized the ALJ for placing the opinion of the treating psychiatrist under more scrutiny than those of the non-treating sources to which

17

he ascribed greater weight.

*Gayheart* did not change the law. Instead, it provided an accurate description of the requirements of the applicable regulations and how the particular ALJ failed to follow them. In this case, however, the ALJ followed the regulations and explained the reasons for its decision. The ALJ pointed out the contradictory opinions of Dr. Purswani and the non-examining State Agency physicians. For example, the ALJ found that the diagnoses of neuropathy and neuralgia were not supported in the treatment record. He took issue with the fact that Dr. Freeman's assessment provided "very little explanation of the evidence relied on in forming that opinion." (Tr. 30). He also stated that "the treatment record of Dr. Freeman failed to reveal the type of significant clinical abnormalities one would expect if the claimant were in fact disabled." (Tr. 30) After reviewing the assessment and comparing it to Dr. Freeman's treatment notes, and the rest of the medical records, the Court agrees with the ALJ's assessment.

Also, nothing in *Gayheart* suggests that the ALJ as the finder of fact may not consider the opinions of examining and non-examining physicians just that more than their opinions is required to justify not giving controlling weight to the treating doctor. The ALJ did not cut corners in providing the Plaintiff with a fair adjudicative process, and it certainly does not seem like he crafted an opinion for the purpose of improperly denying the Plaintiff benefits.

The Court finds that there was substantial evidence to support ALJ's weight accorded to Dr. Freeman's opinion. At least one other district court has reached a similar

18

conclusion with similar reasoning, post-*Gayheart*. *See, Ziggas v Colvin*, 2014 WL 1814019 (S.D. Ohio, 2014).

For the same reasons, the Court does not find error in the ALJ not utilizing Dr. Freeman's opinions regarding the Plaintiff having limited use of her hands or that the Plaintiff would miss four or more days of work a month. Indeed, there are several references in the treatment records of Dr. Freeman that the Plaintiff had "normal" extremities, and the use thereof.

The Court would also point out that it is arguable Dr. Freeman was correct to an extent regarding the Plaintiff's limitations as they existed on August 17, 2011. After all, the Plaintiff did eventually have back surgery in March, 2013, and reported improvement in her pain. (Tr. 778). So there is substantial evidence that the surgery rendered portions of Dr. Freeman's opinion "obsolete."

The Court finds that the ALJ did not err in the weight that he assigned to Dr. Freeman, and he explained his findings in that regard. There was substantial evidence for the ALJ's RFC finding and for the question to the VE. Accordingly, it is respectfully recommended that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 13] be DENIED, and the Defendant Commissioner's Motion for Summary Judgment [Doc. 15] be GRANTED.[1]

Respectfully submitted,

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

s/Clifton L. Corker
United States Magistrate Judge